UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IN THE MATTER OF AN APPLICATION OF       )
THE UNITED STATES OF AMERICA FOR A       )       M.J. Nos.  19-1244-DLC
SEARCH WARRANT FOR (1)  197              )                  19-1245-DLC
HILDRETH STREET,  APT. 46, LOWELL,       )
MASSACHUSETTS 01850 (**"TARGET**         )
**LOCATION A-1"**) AND ALL TELEPHONES    )
LOCATED IN OR ON THE PREMISES and        )
(2)  69 BAILEY STREET, LAWRENCE,         )
MASSACHUSETTS 01843  (**"TARGET**        )
**LOCATION A-2"**) AND ALL TELEPHONES    )       **FILED UNDER SEAL**
LOCATED IN OR ON THE PREMISES            )
                                         )

AFFIDAVIT IN SUPPORT OF APPLICATION

I, Special Agent Jill Hardie, being duly sworn, depose and state that:

1. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.  I have been employed as a Special Agent with the Drug Enforcement Administration ("DEA") since September 2016.  I currently am assigned to the New England Field Division's Task Force 1 located in the Boston Office.  Prior to my employment as a Special Agent, I was employed as a DEA Diversion Investigator from May 2012 to August 2016.  As a Diversion Investigator, I was assigned to the DEA Boston Tactical Diversion Squad, a task force created to disrupt and dismantle those suspected of diverting licit pharmaceuticals and/or chemicals.  Prior to my employment with DEA, I was employed an Intelligence Analyst at the New York/New Jersey High Intensity Drug Trafficking Area (HIDTA) under Homeland Security Investigation's El Dorado Task Force for three years.

2.   As a DEA Special Agent, I am authorized to investigate violations of the laws of the United States, including violations of federal narcotics laws in Title 21 of the United States Code.  I have received training regarding narcotics investigations while attending the Basic Agent Academy in Quantico, Virginia, and have attended additional specialized training courses in furtherance of my past and current assignments.

3.   I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations.  I have also reviewed recorded conversations and telephone, financial, and drug records.  Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs.  I have also become familiar with the manner in which narcotics organizations utilize various forms of violence and intimidation in furtherance of their narcotics trafficking activity, to protect their operations, members, narcotics, and narcotics proceeds.

4.   Based on my training and experience, I am also aware that drug traffickers commonly use cellular telephones to communicate about and further their drug trafficking activities, but are aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and cellular telephones, use multiple cellular telephones simultaneously, and use prepaid cellular telephones (where the subscriber of the phone is not required to provide personal identifying information) in an effort to thwart law enforcement's use of electronic surveillance.  I am also aware that drug traffickers often speak in vague, guarded, or

coded language when discussing their illegal business in an effort to prevent detection, and often use text messages in lieu of phone calls to avoid speaking over the telephone.

## PURPOSE OF AFFIDAVIT

5. I submit this affidavit in support of Applications for:

a. A Search Warrant for 197 Hildreth Street, Apt. 46, Lowell, Massachusetts 01850 (hereinafter, the "Target Location A-1") and all telephones located therein. Target Location A-1 is described as follows: 197 Hildreth Street, Lowell, Massachusetts is located within the Parkside Village apartment complex. Target Location A-1 is a three-story multi-unit brick building with green shutters. The number "197" is marked in white lettering on the front glass door with white trim. A full description and photographs of Target Location A-1 are attached hereto as Attachment A-1, which is incorporated herein by reference.

b. A Search Warrant for 69 Bailey Street, Lawrence, Massachusetts 01843 ("Target Location A-2") and all telephones located therein.  Target Location A-2 is described as follows:  69 Bailey Street, Lawrence, MA is a two-story single family house covered in blue clapboard siding.  Target Location A-2 is enclosed by a white concrete fence with white and blue rails and spindles. There is also a white vinyl stockade fence around the backyard. The number "69" is marked in gold letters on the front door which is white in color. In addition, there are multiple signs around the property noting security cameras are in use.  A full description and photographs of Target Location A-2 are attached hereto as Attachment A-2, which is incorporated herein by reference.

3

6. I am familiar with the facts and circumstances of this investigation from my own personal participation and from oral and written reports made to me by agents of the DEA and other federal, state, and local law enforcement agencies. I have also reviewed information from a variety of additional sources, including a confidential source of information, and consensually recorded telephone calls. For the reasons set forth herein, I believe there is probable cause to believe that evidence of drug trafficking offenses in violation of Title 21, United States Code, Section 841(a)(1) (possession with intent to distribute and distribution of controlled substances) will be located in Target Location A-1and Target Location A-2, collectively the Target Locations.

7. This Affidavit is submitted for the limited purpose of establishing probable cause to believe that evidence of criminal activity will be located inside the Target Locations and on cellular telephones located therein. Accordingly, I have not included each and every fact known to me and other law enforcement officers involved in this investigation. I have set forth only the facts that I believe are needed to establish the requisite probable cause.

<u>EVIDENCE IN SUPPORT OF PROBABLE CAUSE</u>

8. Beginning in or about February of 2019, agents received information from a confidential source of information (the "CS")[1] that Juan FELIX JIMMENEZ a/k/a "Don

---

[1] Investigators obtained information about JIMMENEZ and MATEO MEJIA from a confidential source (hereinafter, "CS-1"). CS-1 began cooperating with law enforcement in 2019 in exchange for monetary compensation. CS-1 has no criminal record. CS-1's cooperation has led to the successful purchase of drugs. However, in late July 2019, CS-1 told investigators about illegal activity that CS-1 engaged in without authorization. Specifically, CS-1 brought another individual to an address in New York for the purpose of picking up narcotics. At that location, CS-1 assisted in counting out fentanyl pills for the purposes of delivery to an associate of CS-1. CS-1 admitted to knowing about the narcotics trafficking activities of that associate but hiding that information from CS-1's handlers. CS-1 stated that the narcotics trafficking activities of that individual may have resulted in an overdose death. According to CS-1, CS-1 made this recent disclosure to investigators because CS-1 was upset about the overdose death referenced above.

Miguel", hereinafter JIMMENEZ, and Francisco MATEO MEJIA, a/k/a "Efrain" were

distributing fentanyl pills in the Lawrence, MA area. During the investigation, CS contacted and

purchased fentanyl pills from MATEO MEJIA and JIMMENEZ through the assistance of a third

party known as "Mata." As set forth herein, the Target Locations are either the residence of

MATEO MEJIA or the residence of a paramour or friend of either MATEO MEJIA or

JIMMENEZ. During the course of the controlled purchases described herein, MATEO MEJIA

and JIMMENEZ either left one of the Target Locations prior to a controlled purchase meeting or

met at a Target Location after a controlled purchase.

June 2019 Controlled Purchase from MATEO–MEJIA and JIMMENEZ and Target
Location A-1

9. On June 4, 2019, at approximately 3:25 p.m., the CS made a call to Mata who, in

turn, said he would contact MATEO MEJIA to place the order. During recorded calls with Mata

to set up the meeting, the CS told Mata to set up a meeting "because I have something that I am

going to…give you a couple of pesos for that, you heard?" Based upon my training and

experience, the CS told Mata that the CS was going to pay for the drugs ("give you a couple of

pesos for that…"). The CS then told Mata to "call this guy, Efrain…..to…uh…I need 500." I

understood that the CS was referring to MATEO MEJIA by the name Efrain and that the CS was

telling Mata that the CS wanted 500 pills. Mata confirmed by asking "you want 500 buttons?"

which I understood to mean 500 pills.

---

Investigators believe that CS-1 may still be minimizing his involvement with the above-referenced overdose death. Investigators intend to deactivate CS-1 from active work with DEA, subject to further consultation with other law enforcement officials. However, notwithstanding this disclosure, investigators believe that information provided by CS-1 pursuant to this investigation is reliable. Specifically, information provided by CS-1 during the course of this investigation has been corroborated and, as a result, I believe that the information provided by CS-1 in this investigation is reliable.

10. Prior to meeting, agents searched the CS and the CS's car for money or contraband with negative results. Agents provided the CS with $3500 in official agency funds to conduct the transaction. Agents also provided the CS with an audio and video recording device.

11. At approximately 3:58 p.m, the CS placed another call to Mata who stated that MATEO MEJIA told him that he needed an hour. At approximately 4:39 p.m., officers observed MATEO MEJIA leave his residence, Target Location A-1[2], with a female. MATEO MEJIA and the female entered an Infiniti, MA Reg. 7WT819 ("Infiniti")[3] and travelled toward Lawrence, MA. The Infiniti was observed stopping at an intersection in Lawrence, MA and when the Infiniti pulled away from the area, it was only occupied by a male driver. At approximately 5:26 p.m., the Infiniti was then observed traveling to the area of 137 Erving Avenue, Lawrence, MA. Approximately ten minutes later, JIMMENEZ was seen leaving 137 Erving Avenue and getting into the driver's seat of the Infiniti. MATEO MEJIA entered the passenger seat and the two left the area. The Infiniti traveled to the area of Bailey Street in Lawrence, MA. Agents were unable at that time to see which building JIMMENEZ and MATEO MEJIA entered.

12. At approximately 5:55 p.m., the Infiniti was seen leaving Bailey Street and returning to the area of Erving Avenue. At that time, Mata received a phone call and told the CS that

---

[2] MATEO MEJIA's Massachusetts driver's license lists his residence as 197 Hildreth Street, Lowell, MA. Additionally, investigators received a copy of an insurance claim submitted by MATEO MEJIA for an injury related to an automobile accident which listed his addressed as 197 Hildreth Street, 46, Lowell, MA.

[3] During this investigation, this court authorized the installation of a GPS on the Infiniti (19-mj-1207-DLC). The Infiniti is registered to Odilenny Tamarez, who I believe to be a paramour of MATEO MEJIA.

"they" are bringing it now. Officers noted a red Dodge Avenger, MA Reg., 7FY796, parked in the lot of 137 Erving ("the Red Dodge"). [4]

13. The Infiniti was observed by law enforcement officials traveling directly to the area behind a supermarket at 187 Lawrence Street, Lawrence, MA. Law enforcement officers observed Mata meet with both JIMMENEZ and MATEO MEJIA on the street. Mata then came back to the CS's vehicle and gave the CS approximately 500 pills. The CS gave Mata $3000 and Mata walked back in the direction of the supermarket. Mata then returned to CS's vehicle. Mata was driven two blocks by CS and Mata then walked away.

14. CS then met with law enforcement at a pre-determined location. Your affiant examined the approximately 500 pills after CS turned them over to law enforcement. They are blue round tablets imprinted with "M" on one side and, on the other side, there is an imprint of a line and the number "30." In my experience, the pills were made to resemble oxycodone 30 milligram tablets. The items were field tested using a TacticID device and tested positive for the presence of fentanyl.

June 2019 Surveillance of MATEO MEJIA and JIMMENEZ and Target Location A-2

15. On June 17, 2019, officers observed the Infiniti in the vicinity of Target Location A-2. Approximately ten minutes later, law enforcement observed the Infiniti and the Red Dodge in an alleyway behind Bailey Street. As noted, it is believed that Target Location A-2 is the residence of Mota, the registered owner of the Red Dodge used by JIMMENEZ. Shortly

---

[4] During the course of this investigation, this court authorized the installation of a GPS on the Red Dodge (19-mj-1084-DLC) and JIMMENEZ was frequently spotted operating this vehicle. The registered owner of the Dodge Avenger is Ydani Mota, whose address on Massachusetts criminal justice records is listed as 69 Bailey Street, Lawrence, MA. (Target Location A-2).

thereafter, the Infiniti left the area while the Red Dodge remained in the alleyway.  Officers

followed the Infiniti to Lynn, MA., where MATEO MEJIA was observed behind the wheel.   A

second male, carrying two weighted bags, approached the vehicle.  Due to traffic, law

enforcement's view at that point was blocked.   When the traffic cleared, the male was no longer

visible and the Infiniti left the area.

16.   About an hour later, the Infiniti was observed pulling up in front of Target

Location A-2.  JIMMENEZ was outside the building with a phone in his hand.  MATEO MEJIA

exited the Infiniti and spoke with JIMMENEZ.   Both individuals were inside the gated area of

Target Location A-2.  Afterwards, MATEO MEJIA departed the area of Target Location A-2 in

the Infiniti.

July 2019 Controlled Purchase and Target Locations A-1 and A-2

17.   On July 16, 2019, the CS made a controlled purchase of approximately 700

tablets from MATEO MEJIA for $5,000.

18.   At approximately 3:15 p.m., the CS placed a recorded call to Mata and told Mata

to "call our man and tell him to get us 700."  I understood the CS to be placing an order for 700

pills.  Mata had already placed a call earlier to MATEO MEJIA and was waiting to hear back

from him.  Mata told the CS that "he's [MATEO MEJIA] not going to give it to me without the

money" meaning that the CS had to provide money to Mata in order to get the pills from

MATEO MEJIA.  Mata called the CS later and said that it appeared that MATEO MEJIA's

phone was disconnected and he would try another way to reach him.   A short time later, Mata

called the CS and said that MATEO MEJIA would be ready to meet in an hour.

19.  At approximately 4:09 p.m., MATEO MEJIA was observed leaving Target Location

A-1.  At approximately 4:41 p.m., MATEO MEJIA was seen traveling to Groton Street in

Lawrence and was seen entering a bodega on the corner of Groton and South Broadway. MATEO MEJIA exited with a small bag and re-entered the Infiniti.

20.   Shortly thereafter, CS called Mata and stated that CS was on the way to meet Mata. Prior to meeting, agents searched the CS and the CS's car for money or contraband with negative results.  Agents provided the CS with $5,000 in official agency funds to conduct the transaction with MATEO MEJIA. Agents also provided the CS with an audio and video recording device. The CS called Mata and said that the CS was on the way to meet Mata.

21. A few minutes after CS called Mata, officers observed the Infiniti pulling into the drive way of 2 Lenox Street, Lawrence, MA., which I have reason to believe is the residence of MATEO MEJIA's paramour.  At approximately 5:30 p.m., MATEO MEJIA was observed exiting 2 Lenox Street and re-entering the Infiniti.  At the same time, Mata, who was picked up by the CS, called MATEO MEJIA to determine the time of his arrival.   MATEO MEJIA told Mata to come to Lexington Street but, instead, Mata told MATEO MEJIA to come to his residence at 338 Hampshire Street, Lawrence, MA.

22.   MATEO MEJIA arrived in the area of 388 Hampshire St. where Mata entered the Infiniti. A few minutes later, Mata exited the Infiniti and entered the CS's vehicle where he could be heard saying "730 pills".  The CS then passed the money to Mata who exited the vehicle, walked back to the Infiniti, and re-entered the vehicle.  The Infiniti then left the area and pulled over by the Union Market on Park St. where Mata exited the vehicle. The Infiniti traveled around the area for a few minutes before ultimately parking across from 137 Erving Ave., Lawrence.

23.   A few minutes later, a law enforcement officer observed MATEO MEJIA on foot near 137 Erving Ave. where he was seen conversing with two occupants in a Honda Accord bearing 17V16  before entering the building on Erving. A short time after, MATEO MEJIA was

9

observed exiting the building, entering his Infiniti, and departing the area.  A short while later,

law enforcement officers observed the Infiniti arrive at Target Location A-2.  JIMMENEZ was

observed exiting Target Location A-2 and entering the Infiniti for a few minutes.  JIMMENEZ

then exited the vehicle and re-entered Target Location A-2.   When JIMMENEZ first exited

Target Location A-2, both his arms were at his side,  When JIMMENZ exited the Infiniti, his

right hand was in his pocket as if he was holding something.

24.   The CS was followed by law enforcement to a predetermined meeting location. The

CS provided a clear plastic bag containing blue pills to your affiant.  Mata told the CS there were

approximately 730 pills in the bag.  Your affiant observed that the pills were in a clear plastic

bag and were blue in color with the imprints of "M" and "30" on each pill. Drug analysis is not

yet available for these pills.

### AUGUST 2019 CONTROLLED PURCHASE FROM MATEO MEJIA AND JIMMENEZ and Target Locations A-1 and A-2

25.   On August 1, 2019, the CS contacted Mata to arrange a purchase of pills telling Mata

to "… call the buddy and tell him that 700 pesos" meaning that the CS wanted to buy another

700 pills from MATEO MEJIA.  Shortly after the initial calls between the CS and Mata, officers

observed MATEO MEJIA and a Hispanic female exiting his residence at Target Location A-

1and entering the Infiniti.  The Infiniti was observed traveling towards Lawrence, MA., where it

arrived at Target Location A-2.  MATEO MEJIA was alone at this time; it is believed the female

was dropped off at a shopping plaza that MATEO MEJIA went to before arriving at the Target

Location A-2.

26.   Prior to the meeting, the CS and CS's vehicle were searched for any contraband with

negative results.  The CS was provided with $5,000 in order to make the purchase.

27.   Mata called MATEO MEJIA to determine his location. At that time, MATEO

MEJIA was observed still sitting in the Infiniti at Target Location A-2.  A black Chevrolet Sonic

("the Sonic") bearing MA Reg. 9VL466 pulled up to Target Location A-2 and parked.  MATEO

MEJIA then exited his vehicle and began walking towards Target Location A-2, looking up and

down the street as he walked. A few seconds later, JIMMENEZ exited the Sonic and also began

looking up and down the street as he walked toward Target Location A-2.   MATEO MEJIA

walked up the driveway of Target Location A-2 and entered through a fence gate toward the

back of the residence.[5]   At or about the same time, JIMMENEZ was observed walking through

the front door of Target Location A-2. JIMMENEZ appeared to use a key to open the door.

28.   Approximately 25 minutes later, MATEO MEJIA left from the driveway area of

Target Location A-2, entered the Infiniti, and left the area.   MATEO MEJIA was observed

pulling up to 388 Hampshire Street (Mata's residence) where he parked in front of the residence.

CS and Mata were already at the residence when MATEO MEJIA arrived in the Infiniti.  MATA

left the CS's vehicle, entered the Infiniti, and came back with the pills.  The CS transferred the

money to Mata who took it back to the Infiniti.   After Mata left the CS's vehicle, the CS was

followed back to a pre-determined meeting location. The CS provided law enforcement with a

blue latex glove that contained a clear plastic bag with blue tablets marked with "M" and "30" on

them.  A field test was performed utilizing a TacticID device that indicated that the pills tested

positive for fentanyl.

<u>DRUG TRAFFICKERS' USE OF RESIDENCES</u>
<u>AND CELLULAR TELEPHONES</u>

---

[5]   Your affiant observed the back of the residence from an alley and observed a back door to
the residence in the fenced-in area.

29.   Based on my training and experience, and the collective experience of other investigators participating in this investigation, I know that traffickers of controlled substances frequently maintain, at their residences, quantities of illicit drugs to maintain their ongoing drug business.  I also know that traffickers often use multiple residences and vehicles including the residences and vehicles of other individuals such as friends, relatives and/or paramours in order to avoid identification as to either real or personal property belonging to the traffickers.   I also know that traffickers of controlled substances usually keep, in addition to drugs, paraphernalia for the packaging, diluting, cutting, weighing, processing, and distributing controlled substances, including scales, plastic bags, cutting agents, and utensils at their residences or stash locations. Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to store drug-related paraphernalia in their residences for longer periods of time than they keep drugs in their residences.

30.   Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences of drug-traffickers, it is generally a common practice for drug traffickers to maintain in their residences records relating to their drug trafficking activities.  Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, record-keeping is necessary to keep track of amounts paid and owed, and such records are often kept close at hand so that current balances can be verified and recorded.  Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers.  Additionally, drug traffickers often maintain

telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.  I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

31.  Even when drug dealers store their drugs outside their residences, I know that they often will keep records relating to these offsite storage locations at their primary residences. Such documents include rental or storage property agreements and receipts.

32.  Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that it is generally a common practice for drug traffickers to conceal at their residences either the proceeds from drug sales or monies to be used to purchase controlled substances.  Drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances, and evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking are often kept in their residences.  Moreover, the cash proceeds of drug trafficking often contain traces of the narcotics sold or bought by the drug dealers.

33.  Moreover, drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities, and many of these cellular telephones are kept at their residences.  It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses.  Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them.  Therefore, while it is common for drug traffickers to stop using

cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones.  As a result, I am aware that collections of cell phones have been found during drug trafficking search warrants that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

34.  When drug traffickers amass proceeds from the sale of drugs, they often attempt to launder/legitimize these profits, or otherwise conceal them from discovery by law enforcement. In an effort to accomplish these goals, drug traffickers often place assets, such as vehicles and residences, in the names of other persons to conceal their true ownership and the manner in which they were acquired.  Records reflecting the implementation of such deceptive practices, such as deeds, titles, and service records, are likely to be found inside the residence of the drug trafficker.

35.  Finally, as noted above, evidence of drug crimes can be found in the cell phones and smart phones referenced in the preceding paragraphs.  Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails, text messages or instant messages.  From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B on their cellular telephones.

36.  It should be noted that, with the advance of technology, the distinction between computers and cellular telephones is quickly becoming less clear.  Actions such as internet searching or emailing, in addition to calling and text messaging, can now be performed from many cell phones.  In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular telephones.  Contemporaneous possession of multiple

cellular telephones is, therefore, evidence of drug trafficking.  Moreover, the particular numbers

of and the particular numbers dialed by particular cellular telephones can be evidence of drug

trafficking.

37.  As with most electronic/digital technology items, communications made from an

electronic device, such as a computer or a cell phone, are often saved or stored on the device.

Storing this information can be intentional, for example, by saving an e-mail as a file on a

computer or saving the location of one's favorite websites in "bookmarked" files.  Digital

information can also be retained unintentionally.   Traces of the path of an electronic

communication or of an internet search may be automatically stored in many places on a

computer or a cell phone.  In addition to electronic communications, a user's Internet activities

generally leave traces in the web cache and Internet history files.  A forensic examiner often can

recover evidence that shows when and in what manner a user of an electronic device, such as a

computer or a cell phone, used such a device.

38.  Electronic files or remnants of such files can be recovered months or even years after

they have been downloaded, deleted, or viewed via the Internet.  Electronic files downloaded to a

hard drive can be stored for years at little or no cost. Even when such files have been deleted,

they often can be recovered months or years later using readily available forensic tools.  When a

person "deletes" a file on an electronic storage device such as a computer, the data contained in

the file often does not actually disappear; rather, that data often remains on the device until it is

overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free

space or slack space -- that is, in space on a device that is not allocated to an active file or that is

unused after a file has been allocated to a set block of storage space -- for long periods of time

before they are overwritten.  In addition, a computer's operating system may also keep a record

of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the

Internet are automatically downloaded into a temporary Internet directory or "cache."  The

browser typically maintains a fixed amount of hard drive space devoted to these files, and the

files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus,

the ability to retrieve residue of an electronic file from an electronic storage device depends less

on when the file was sent, downloaded, or viewed than on a particular user's operating system,

storage capacity, and habits.

      39.  I have participated in the execution of numerous search warrants at the residences of

drug traffickers similar to the target of this investigation.  In a substantial number of residential

searches executed in connection with the drug investigations in which I have been involved, the

following types of drug-related evidence typically have been recovered in both conventional and

electronic formats:

      a.   controlled substances, such as fentanyl;

      b.   paraphernalia for packaging, processing, diluting, weighing, and
distributing controlled substances, such as scales, funnels, sifters, grinders,
glass panes and mirrors, razor blades, plastic bags, microwave ovens, heat-
sealing devices, and diluents such as mannitol, mannite, and inositol;

      c.   books, records, receipts, notes, ledgers, letters, and other papers relating to
the distribution of controlled substances, travel for the purpose of
acquiring and/or distributing controlled substances, and to monetary
transactions involving the proceeds from the sale of controlled substances;

      d.   personal books, papers, and other electronic devices reflecting names,

addresses, telephone numbers, and other contact or identification data

relating to the distribution of controlled substances, money laundering,

and the criminal use of communication facilities;

e.  cash, currency, and records relating to the generation of income from the

sale of controlled substances and the expenditure of such income,

including money orders, wire transfers, cashier's checks and receipts, bank

statements, passbooks, checkbooks, and check registers, as well as

consumer items such as electronic equipment, vehicles, jewelry, and

precious metals such as gold and silver, and precious gems such as

diamonds - it should be noted that possession of the valuable items

referenced in this paragraph, particularly by individuals with no

substantial legitimate source of income, is evidence of drug trafficking as

opposed to drug use;

f.  documents and other records indicating travel in interstate and foreign

commerce, such as maps, GPS coordinates, navigation coordinates, travel

itineraries, plane tickets, boarding passes, motel and hotel receipts,

passports and visas, credit card receipts, and telephone bills and related

communications;

g.  cellular telephones, smart phones, electronic tablet devices, and other

electronic media utilized for communication, transportation, and data

acquisition and retention purposes related to acquiring and distributing

illegal drugs and proceeds, including incoming and outgoing call and text

message logs, contact lists, photo and video galleries, sent and received

text messages, online searches and sites viewed via the internet, online or

electronic communications sent and received (including email, chat, and

instant messages), sent and received audio files, navigation, mapping, and

GPS files, telephone settings (including contact lists) text messages, and

related identifying information such as telephone identification numbers,

call forwarding information, messages drafted but not sent, and voice

messages;

h.   firearms and other dangerous weapons; and,

i.   identification evidence and/or indicia, such as cell phones with  particular

numbers, mail, deeds, leases, rental agreements, photographs, bills, and

identification documents, that tend to identify the person(s) in residence,

occupancy, control, or ownership of subject premises and/or subject

communication devices.

## CONCLUSION

40.  Based on all of the information I have obtained during the course of this

investigation, and for the reasons more specifically set forth herein, I believe that MATEO-

MEIJA and JIMMENEZ are fentanyl distributors; that they use the Target Locations to keep

drugs, drug paraphernalia, and/or drug proceeds there, and that evidence of their drug trafficking

activity will be found inside the Target Locations, as well as in cellular telephones seized

therefrom.

18

41.  I also believe there is probable cause to believe that the Target Locations and cellular telephones recovered therefrom presently contain the items set forth in Attachment B hereto, which is incorporated herein by reference, and that those items constitute evidence of the commission of criminal offenses, contraband, the fruits of crime, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as the means of committing a criminal offense, specifically, violations of Title 21, United States Code, Section 841.  *See, e.g., United States v. Feliz,* 182 F.3d 82, 87 88 (1st Cir. 1999).[6]

I declare that the foregoing is true and correct.



JILL HARDIE
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me,
this 20th day of August, 2019

HONORABLE DONALD L. CABELL
United States Magistrate Judge
District of Massachusetts

---

[6]  In *Feliz*, the First Circuit made clear that, in the drug trafficking context, evidence of drug transactions can be expected to be found in a drug trafficker's residence for months after evidence of the last transaction. 182 F.3d at 87 ("[C]ourts have upheld determinations of probable cause in trafficking cases involving [three months long] or even longer periods") (*citing United States v. Greany*, 929 F.2d 523, 525 (9th Cir. 1991)(two year-old information relating to marijuana operation not stale)).  As the First Circuit has explained "[b]y its very nature, drug trafficking, if unchecked, is apt to persist over relatively long periods of time." *United States v. Nocella*, 849 F.2d 33, 40 (1st Cir. 1988).